IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES TURNELL AND WINDWARD ROOFING & CONSTRUCTION, INC., | )<br>)<br>) |
| Plaintiffs, | )    13 C 2660 |
| v. | )<br>)    Judge Virginia M. Kendall |
| CENTIMARK CORPORATION, | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

Centimark Corporation seeks a preliminary injunction that prohibits former employee James Turnell from working for Windward Roofing & Construction, Inc. pending a trial on the merits. The parties' dispute concerns an employment agreement between Centimark and Turnell that contains several restrictive covenants. Turnell opposes Centimark's motion for a preliminary injunction. This Court held an evidentiary hearing on Centimark's motion on February 11, 2014. For the reasons stated herein, this Court grants Centimark's motion.

## **BACKGROUND**

This Court makes the following findings for purposes of deciding Centimark's motion for a preliminary injunction. This Court makes these findings based on the evidence received during its hearing on Centimark's motion and in the pleadings and exhibits submitted in connection with Centimark's motion.

Centimark and Turnell entered an employment agreement on May 1, 1988. (Dkt. No. 34-3.) Article IV of the Centimark-Turnell Agreement contains several covenants and agreements concerning the non-disclosure of confidential information (Dkt. No. 34-3 at § 4.01), the return of

materials (Dkt. No. 34-3 at § 4.04), restrictions on competition (Dkt. No. 34-3 at § 4.05), the solicitation of customers and suppliers (Dkt. No. 34-3 at § 4.06), and the solicitation of employees (Dkt. No. 34-3 at § 4.07). Turnell entered the Centimark-Turnell Agreement after having worked full-time at Centimark for about ten years. (Dkt. Nos. 79-80, Hr'g Tr. at 113:6-7 (Feb. 11, 2013).) After entering the Centimark-Turnell Agreement, Turnell worked for Centimark for another twenty-five years until Centimark fired him on January 8, 2013. (Hr'g Tr. at 113:8-12.) Centimark purportedly fired Turnell for misappropriation or theft. (Hr'g Tr. 58:17-59:9, 123:10-13.) In his thirty-five years at Centimark, a commercial roofing business (Hr'g Tr. at 39:14-24), Turnell worked in the roofing industry as a laborer, foreperson, manager (Hr'g Tr. at 145:5-10), and in sales (Hr'g Tr. at 147:14-18).

Shortly after Centimark fired him, Turnell agreed to work for Windward. (Hr'g Tr. at 123:17-25, 126:1-13.) Windward is a small company that provides several services in the Chicagoland area that includes commercial roofing, which comprises nearly half of Windward's business. (Hr'g Tr. at 126:17-22, 173:3-14, 175:19-176:20.) At Windward, Turnell has worked in roofing sales since starting there around March 1, 2013. (Hr'g Tr. at 112:18-23.) His job at Windward requires him to find new customers. (Hr'g Tr. at 131:10-14.) In fact, Turnell cannot solicit business from existing Windward customers. (Hr'g Tr. at 131:15-25.) In his time at Windward, Turnell has called on Centimark's customers (Hr'g Tr. at 167:15-17) using techniques similar to those employed by Centimark and has submitted bids to existing and potential Centimark customers (Hr'g Tr. at 135:12-137:3). As of February 11, 2014, Centimark has lost at least one job to Windward. (Hr'g Tr. at 91:13-18, 161:7-10.)

## **LEGAL STANDARD**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Goodman v.*

*Illinois Department of Financial and Professional Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (alteration and emphasis in *Goodman*). The movant must show a likelihood of success on the merits, that no adequate remedy at law exists, that it will suffer irreparable harm absent injunctive relief and that the harm outweighs any harm to the non-movant should an injunction issue, and that an injunction will not harm the public interest. *Id.* When considering whether to issue a preliminary injunction, courts must weigh these factors using a sliding scale approach such that the greater the movant's likelihood of success on the merits the less the balance of harms need favor the movant and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

Here, the Centimark-Turnell Agreement includes a choice of law provision that identifies Pennsylvania law as the governing law. Although disfavored as a restraint on trade, restrictive covenants such as non-compete agreements are enforceable in equity under Pennsylvania law. *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 424 (3d Cir. 2010). One can enforce a non-compete agreement under Pennsylvania law when the restrictive covenant is incident to an employment relationship between the parties, is reasonably necessary for the employer's protection, and is reasonably limited in duration and geographic scope. *Id.* A restriction is reasonably necessary for the employer's protection when tailored to protect the employer's legitimate business interests. *Id.* The party challenging the restriction must prove its unreasonableness, *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), which is a fact-intensive inquiry, *id.* at 237.

**DISCUSSION**

A.  **Centimark's Likelihood of Success on the Merits**

"Pennsylvania enforces restrictive covenants that are 'reasonably necessary for the protection of the employer's protectable business interests' such as trade secrets and other confidential information, if the restrictions 'are reasonably limited in duration and geographic extent.' " *CertainTeed Corp. v. Williams*, 481 F.3d 528, 529 (7th Cir. 2007) (quoting *Hess v. Gebhard & Co.*, 570 Pa. 148, 162, 157 (2002)). Examples of legitimate business interests include trade secrets, confidential information, goodwill, unique or extraordinary skills, and specialized training that would benefit competitors. *Zambelli*, 592 F.3d at 424.

1.  **Protectable Business Interests**

Centimark claims that the restrictive covenants at issue are necessary to prevent Turnell from using Centimark's customer lists, strategic plans, discounts, pricing practices, and product margins against Centimark when soliciting business for Windward. Even though Turnell claims to only have a vague understanding of Centimark's pricing system (*see*, *e.g.*, Hr'g Tr. at 159:7-20), he has some understanding of how Centimark prices jobs and knows what profit margins result from Centimark's pricing system (Hr'g Tr. at 157:15-158:11). As he acknowledged in the Centimark-Turnell Agreement, Turnell understood that Centimark considered such information confidential. (Dkt. No. 34-3 at p.4.) This confidential information concerning Centimark's pricing system and profit margins qualifies as a protectable business interest. The same is true for any goodwill Turnell established with customers while at Centimark. A preexisting relationship arising from a continuous course of business is an example of a business's goodwill. *Zambelli*, 592 F.3d at 424 (Pennsylvania law recognizes goodwill as a protectable business interest).

But the sales methods Turnell learned while at Centimark are not protectable business interests. Leaving jars of candy or buckets filled with shirts, golf balls, and other items with

potential customers is a common technique used by salespersons in a range of industries. It is not a unique or extraordinary skill and does not require any specialized training.

### 2. The Non-Disclosure Covenant

Section 4.01 of the Centimark-Turnell Agreement prevents Turnell's use of Centimark's confidential information "to his own advantage or to the advantage of others . . . ." (Dkt. No. 34-3 at § 4.01). A non-disclosure covenant such as this is not subject to the reasonableness criteria applicable to non-compete covenants. *See Insulation Corp. of Am. v. Brobston*, 446 Pa. Super. 520, 533, 667 A.2d 729, 735 n.7 (Pa. Super. Ct. 1995). But there is no evidence that suggests that Turnell disclosed Centimark's pricing model to Windward. (*See*, *e.g.*, Hr'g Tr. 174:16-18.) Nor is there any evidence that Turnell has the ability to alter the prices offered in bids submitted on Windward's behalf. Rather, Windward uses its own pricing model to determine its prices. (Hr'g Tr. 173:21-174:9.)

Yet Centimark argues that whether Turnell has disclosed or used any of Centimark's confidential information is irrelevant under *CertainTeed*. But *CertainTeed*, which concerned a plant manager privy to his former employer's secret and indiscernible manufacturing processes, is factually distinguishable from this case. In *CertainTeed*, it was not only impossible to reverse engineer the processes used by the plant manager's former employer but also difficult to determine whether the plant manager disclosed his former employer's processes to his new employer. *CertainTeed*, 481 F.3d at 530. Here, Centimark has not shown that its customers and prospective customers do not disclose Centimark's bids to others, who could then undercut those bids, or that the only way a competitor can learn of Centimark's bids is from someone with inside knowledge. Centimark also has not shown that it would be difficult to detect whether Turnell disclosed Centimark's confidential information to Windward.

Another, and more significant distinction, is that the plant manager in *CertainTeed* agreed not to work for one year in a job at another employer "that involves a product, process, apparatus, service or development . . . with respect to which [he] had access to Confidential Information while at [CertainTeed] . . . ." *CertainTeed Corp. v. Williams*, No. 06 C 2992, 2006 WL 1762660 at *2 (N.D. Ill. June 27, 2006) (second alteration in original). This was a valid non-compete covenant defined in part by the type of information the plant manager had access to that did not require proof of disclosure. *CertainTeed*, 481 F.3d at 529. Unlike *CertainTeed*, where the non-disclosure covenant was one aspect of a non-compete covenant, the non-disclosure and non-compete covenants here are separate covenants. Centimark cannot rely on a violation of a non-compete covenant alone to establish a violation of a non-disclosure covenant when the two are independent of each other. Standing alone, the non-disclosure covenant requires some proof that Turnell has disclosed or will inevitably disclose Centimark's confidential information to Windward. Because the evidence received suggests that Turnell has not disclosed or used Centimark's confidential information and, given Windward's own pricing model, that there is no need to, Centimark has not shown that it is likely to succeed on Turnell's alleged breach of § 4.01 of the Centimark-Turnell Agreement.

### 3. The Non-Compete Covenants

Section 4.05 of the Centimark-Turnell Agreement prevents Turnell from working for a competing business in any region in which he has worked for Centimark within two years of leaving Centimark. Section 4.06 of the Centimark-Turnell Agreement prevents Turnell from soliciting or trading with Centimark's customers within two years of leaving Centimark. Centimark has shown that Turnell works for a competing business as both Centimark and Windward sell commercial roofs. (Hr'g Tr. at 121:24-122:6, 126:17-20.) Centimark has also shown that Turnell works in the Chicagoland area, which is a region he covered for Centimark.

(Hr'g Tr. at 126:21-22, 165:16-24.) In addition, Centimark has shown that Turnell has solicited business from customers Centimark had prior to Turnell's departure. (Hr'g Tr. at 134:3-135:22, 142:20-144:1.) By showing that Turnell has leveraged the goodwill established by and while at Centimark, Centimark has shown that it is likely to succeed on the merits with respect to these non-compete covenants. *See Victaulic*, 499 F.3d at 237 (employer has a legitimate interest in protecting its customer relationships).

Turnell has not shown that either covenant is unreasonable with respect to duration or geographic scope. Each covenant limits Turnell for two years, which Turnell has not shown to be unreasonable. Because Turnell has taken a job within the same region in which he worked for Centimark, this Court need not determine whether the reasonableness of the full geographic scope of the covenants because restricting Turnell's activities in the Midwest was reasonable. *See Victaulic*, 499 F.3d at 237 (restrictions consonant with the scope of an employee's duties are reasonable).

Nor has Turnell shown that Centimark cannot enforce Sections 4.05 and 4.06 because it fired Turnell. Pennsylvania law does not favor enforcement of restrictive covenants against employees fired for poor performance. *See Colorcon, Inc. v. Lewis*, 792 F.Supp.2d 786, 801 (E.D. Pa. 2011) (analyzing *Insulation Corp. of America v. Brobston*, 446 Pa. Super. 520, 667 A.2d 729 (Pa. Sup. Ct. 1995)). Here, Centimark fired Turnell for theft—not poor performance. Therefore, Centimark's firing of Turnell is not relevant.

For these reasons, this Court finds that Centimark is likely to succeed on the merits of its claims concerning Sections 4.05 and 4.06 of the Centimark-Turnell Agreement.

**B.     No Adequate Remedy at Law**

Turnell's likely breach of Sections 4.05 and 4.06 of the Centimark-Turnell Agreement threatens harm to Centimark's business for which there is no adequate remedy at law.

Pennsylvania law treats continued violations of restrictive covenants that cause incalculable damage to a former employer's business as grounds for a preliminary injunction. *See Capsicum Group, LLC v. Rosenthal*, No. 2:13-CV-05322-WY, 2013 WL 6667822 (E.D. Pa. Dec. 17, 2013) ("Where a restrictive employment covenant has been violated or is likely to be violated, "the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business [ ] constitutes [ ] justification for equitable intervention.' ") (quoting *Bryant v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164, 1167 (Pa.1977)). Further, Pennsylvania law recognizes that "the injury caused by violation of a covenant not to compete is particularly difficult to quantify for damage purposes." *Records Center, Inc. v. Comprehensive Management, Inc.*, 363 Pa. Super. 79, 86, 525 A.2d 433, 436 (Pa. Sup. Ct. 1987). Here, Centimark has shown several instances in which Turnell called on Centimark customers and, through bids submitted on Windward's behalf, directly competed with Centimark for those customers. This distinguishes this case from *Rollins Protective Services Co. v. Shaffer*, 383 Pa. Super 598, 601, 557 A.2d 413, 414 (1989) ("appellant has failed to produce evidence to prove any harm, even in the form of a threat of injury to his business which resulted from the violation of the non-competition clause of his employment agreement with appellees"), which Turnell cites. And the evidence shows that Centimark and Windward are not the only participants in the market. As a result, one cannot assume that customers would have awarded Centimark every job that Windward won. Nor can one assume that lost jobs are the only measure of Centimark's potential damages. Increased competition from a former employee may lead to lower bids from Centimark. One can only speculate as to whether customers who award jobs to Centimark will do so because of those lower bids. These and other factors make it difficult to quantify the

damages that may result from Turnell's continued violation of the Centimark-Turnell Agreement. Therefore, this Court finds that Centimark has no adequate remedy at law.

## C. Balance of Harms

The balance of harms in this case is neutral when considered using the sliding scale approach. As discussed above, Turnell's likely breach of the Centimark-Turnell Agreement will result in incalculable damages to Centimark. Yet, notwithstanding Turnell's interference, the evidence shows that Centimark's sales have increased ten percent since Turnell's departure. (Hr'g Tr. at 62:6-8.) On the other hand, Turnell will not be able to continue in his current capacity at Windward as a salesperson if enjoined. He would have to rely on his wife, who works outside the home, his retirement plans, or other employment to cover his living expenses. (Hr'g Tr. 164:13-23.) Windward suffers no harm, as it has no right to benefit from Turnell's likely breach of the Centimark-Turnell Agreement and has not shown that Turnell is otherwise indispensable.

Given these harms, an injunction would weigh more heavily on Turnell than the status quo would Centimark. But the harm to Turnell is not significant enough to tip the balance of harms in Turnell's favor because of the strong likelihood that Centimark will be able to enforce Sections 4.05 and 4.06 of the Centimark-Turnell Agreement. Therefore, this Court finds that the balance of harms does not favor either party.

## D. The Public Interest

Neither party has set forth any evidence as to whether an injunction would harm the public interest. This is not a case where an injunction would deprive the public of a vital service that only Turnell can offer. And the requirements that a restrictive covenant be reasonable in duration and geographic scope, as well as reasonably necessary to protect a legitimate business interests offset the limitations a restrictive covenant may place on an individual. In addition,

there is a generalized public interest in enforcing contracts. *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010) (discussing public interest in upholding inviolability of trade secrets and enforceability of confidentiality agreements). Therefore, this Court finds that an injunction would be consistent with the public interest.

## CONCLUSION

Centimark will likely succeed on the merits of its claim that Turnell violated two non-compete covenants in the Centimark-Turnell Agreement. Because of Turnell's likely breach of those covenants, Centimark will likely suffer irreparable harm. Even though the harm to Turnell that may result from an injunction issue is greater than the harm to Centimark absent an injunction, Centimark's likely success on the merits negates the harm Turnell may suffer due to an injunction. Further, an injunction would serve the public interest. Therefore, this Court enjoins Turnell as follows:

> James Turnell shall not sell, attempt to sell, or help sell any products or services, or any combination thereof, related to commercial roofing to any person or entity who was a customer of Centimark Corporation as of January 8, 2013 and who is located in Illinois, Indiana, Michigan, Minnesota, North Dakota, South Dakota, or Wisconsin.

This injunction shall remain in effect until the earlier of a decision on the merits, at which time this Court will issue a final order that supersedes this injunction, or two years from the date of this order.

The scope of this injunction reflects that which is reasonably necessary for the protection of Centimark in view of the evidence presented. *See WellSpan Health v. Bayliss*, 2005 Pa. Super 76, 869 A.2d 990, 996 (Pa. Sup. Ct. 2005) ("It is well-established in Pennsylvania that a court of equity has the authority to reform a non-competition covenant in order to enforce only those provisions that are reasonably necessary for the protection of the employer."). This Court limited

the geographic scope of this injunction to the region Turnell covered while a Centimark employee. This Court limited the injunction to Centimark customers as of the time that Turnell left the company because "prospective customers" as defined in the Centimark-Turnell Agreement is ambiguous due to its breadth—there is no way for Turnell to know who Centimark has contacted since he departed the company. Nor is it fair to restrict Turnell from customers who Centimark unsuccessfully solicited during Turnell's tenure there because the likelihood that Centimark will suffer harm in those instances is minimal.

This injunction does not apply to Windward directly because it was not a party to the Centimark-Turnell Agreement. Although Centimark's complaint makes claims against Windward, the evidence presented in connection with Centimark's motion focused on Turnell's likely breach of the Centimark-Turnell Agreement.

This injunction is effective immediately. Centimark shall post a bond of $250,000 within ten days of this order. If either party objects to the bond amount, then they must file their objections within ten days of this order. Absent leave to do so, pleadings related to the bond amount shall not exceed three pages.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: July 10, 2014